## Hudson Recreation Co. v. Bowling, Billiard & Athletic Employes' Union, Local 209

*George A. Butler*, for plaintiff.
*Edward Davis*, for defendant.

ALESSANDRONI, J., November 13, 1940. — This bill in equity was filed by the Hudson Recreation Company, a corporation engaged in the business of conducting and operating bowling alleys and billiard tables in the City of Philadelphia, to enjoin defendant, an unincorporated labor organization, from interfering in any way with the conduct of complainant's business, from picketing complainant's establishment, and from inducing any employe to go out on strike.

It is averred that on or about September 24, 1940, Thomas Welsh, the business agent of the union, demanded that complainant recognize it as the exclusive bargaining agent; on or about the same date, it is averred that complainant was advised that its employes had organized an association known as The Independent Pinboys Associa-

tion, who likewise demanded that complainant recognize them as the exclusive bargaining agent. To recognize either of these organizations when complainant did not know which of them in fact represented a majority of its employes might result in the commission of an unfair labor practice and a violation of the provisions of the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168. Defendant, however, when complainant refused to enter into a contract with it called upon its members to leave their employment and establish picket lines giving the public notice that the employes of plaintiff were on strike. It is further averred that complainant has been ready and willing to negotiate with whichever organization represented a majority of its employes and to resolve the question filed a petition with the Pennsylvania Labor Relations Board requesting that an election be held. It is finally averred that the picketing which has continued has caused irreparable and immediate damage to complainant.

This bill of complaint was filed on October 1, 1940. A hearing was held by this court on October 11, 1940, at which time it was agreed that the matter be continued for one week pending an election to be held in the interim. Complainant offered to supply the list of employes and to coöperate in bringing about this election. That complainant entered into this agreement in good faith and meticulously attempted to carry it out is evidenced by the report of its counsel of all steps taken by it to the court, as well as by the obvious fact that it was to its interest to ascertain as quickly as possible the identity of the bargaining agent. The agreement failed of execution. Nor have defendants at any time since then charged this failure to the conduct of complainant. On October 18, 1940, the parties again were before the court, at which time defendants offered upon their own initiative to remove the pickets if the company would reinstate the men who went out on strike, and that this status would continue until the Pennsylvania Labor Relations Board had rendered a

decision and if an election were ordered by that board they agreed to abide by the result of that election. Complainant in open court accepted that offer. This, too, failed to bear fruit. As in the case of the agreement to hold an election, the pickets were never removed, although complainant was ready at once to reëmploy the men on strike. It is not charged that the failure to abide by the agreement reached in open court was caused by or contributed to in any manner by complainant. On October 25th testimony was offered in support of the averments in the bill of complaint on this rule for a preliminary injunction.

The Hudson Recreation Company maintains its place of business at the northwest corner of Broad and Cherry Streets, Philadelphia, where it occupies five floors of that building in which there are 105 bowling alleys and other equipment representing an investment of approximately $250,000. About 135 persons are employed by complainant. The character of the employment is somewhat unusual. Approximately 105 persons are employed as pinboys caring for the bowling alleys. Their employment has been characterized as daily movable employment, that is, each employe reports for work and is paid his wage each evening at the end of that day's employment. The employes are under no obligation to return the next day. In fact, it is customary for the employes to report at the stated time and if any of the bowling alleys are open they go to work. If not, they generally go to any of the other establishments of similar character in the city. In the testimony they have been referred to as "floaters." Some of the employes work for complainant every day, others at intermittent periods. The contract of employment by its very nature, therefore, terminates each evening when the employe is paid for his labor, and there is no obligation on either of the parties to renew it the next day.

The major portion of complainant's business consists of league bowling in which various organizations participate at prearranged times. The participants almost

without exception have refused to proceed with their schedules and enter the establishment while pickets proclaim a strike is in progress. For that reason, the strike has resulted in a loss of many thousands of dollars each week. These losses are irretrievable. The disastrous effect may be gleaned from the fact that a number of the important leagues have disbanded for the season and are not likely to be reorganized again.

Complainant's testimony establishes that on February 1, 1940, Mr. Welsh, the business agent of defendant union, called at the company's offices and presented a sample of a contract to be executed with its employes. About ten days later the representative of the union returned for further discussion. He was informed that the agreement called for wages which were less than the prevailing rate paid by the Hudson Recreation Company. After a brief discussion the representative of the union left and did not return until September 24, 1940, when at about 5:15 p.m. Mr. Welsh came into the offices and accused complainant of discharging a member of the union. Mr. Robertson, the manager of complainant, denied any knowledge of such a discharge and Mr. Welsh was unable to name the particular person discharged. After a very brief discussion Mr. Welsh then questioned Mr. Robertson about the agreement which had been left with him. During this discussion one of the employes who was unknown to Mr. Robertson came into the office and stated that his organization represented 67 of the employes whose names he had on a memorandum which he presented. Mr. Robertson asked the boy who he was and what right he had to represent the others. When he informed them Welsh immediately declared that he was calling a strike. This occurred at approximately six o'clock and 31 employes walked out.

The following evening Mr. Robertson received a telephone call from Father McGarrity, who was in charge of one of the largest bowling leagues that made use of complainant's establishment. Father McGarrity offered

to sit in and listen to the controversy that evening. His offer was accepted. The business agent and officers of the union were present, as well as representatives of the management. Mr. Robertson permitted Father McGarrity to conduct the meeting, to circulate through the establishment and talk to any persons he might find, and agreed to abide by any decision made by him and his associates as arbitrators. Unfortunately, however, an agreement could not be reached.

The records of complainant establish that one John Wallis, who was later identified as the person alleged to have been discharged, worked for complainant only two days during the preceding year, namely, December 4, 1939, and September 23, 1940, the day before the representative of the union claimed he had been dismissed for union activities and called a strike. There was no evidence offered by either party to show that John Wallis reported for employment on September 24th, and was refused employment by complainant. This is particularly significant in view of the character of the employment at complainant's place of business.

On behalf of defendant it is established without contradiction that there has been no violence during the course of the picketing. Mr. Welsh testified that it was difficult for him to state how many persons employed by complainant were members of his organization. From February to September 1940, 36 persons became members of the union and approximately 33 more joined in September. Because these persons are "floaters", however, and drift from one establishment to another, there was no way of knowing how many members of the union actually worked at complainant's establishment during the month of September. He testified that on the 24th of September he called upon Mr. Robertson because John Wallis had been fired without any just cause. Mr. Robertson, he said, became very angry and challenged Welsh to call a strike. Right at this time a person unknown to him came to the office unannounced and stated that he repre-

sented the Independent Pinboys Association and that that organization had in its membership a majority of complainant's employes. An argument ensued as a result of which Mr. Welsh left and the strike was called.

Mr. Welsh further testified that, at the conference attended by Father McGarrity, Mr. Robertson obstructed all efforts to reach an agreement, and that the meeting finally terminated when Knorr, the representative of the Pinboys Association, stated that Robertson promised him and his associates an increase in salary. This was categorically denied by Robertson when called in rebuttal. Welsh then stated that the arbitrators concluded that this was a company-dominated union and refused to become further involved. As a result of this the union filed a charge of unfair labor practices against the company with the Pennsylvania Labor Relations Board. Hearings have been held on both complainant's petition for an election and defendant's charges that have not as yet been concluded by the board.

On cross-examination Mr. Welsh admitted that from the beginning Mr. Robertson had permitted him to enter the premises of the Hudson Recreation Company in an effort to unionize the employes.

Other testimony was offered on behalf of defendant by members of the union in which they stated that they were on strike because John Wallis had been discharged. Wallis was never produced at any hearing and defendant admitted that his whereabouts are unknown. The witnesses also testified that they had never been asked to join the Independent Pinboys Association and had not heard of it prior to the strike.

Although defendant emphatically stated that Father McGarrity refused to become involved in a controversy because of the presence of a company-dominated union, no subpœna was ever issued to compel his presence, although the court permitted a continuance to have the benefit of his testimony. At the adjourned hearing counsel for de-

fendant stated that Father McGarrity did not care to testify.

The facts in this case have been set forth at length, since the difficulties involved do not rest in the uncertainty of any of the pertinent rules of law, but rather in their application to this particular case. The Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, which took away from courts of equity the power of injunction in cases involving labor disputes, was amended by the Act of June 9, 1939, P. L. 302, which restored that power in certain instances, one of which occurs where any labor organization engages in a course of conduct intended to coerce an employer to commit a violation of the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168. Another situation in which the power to issue an injunction has been restored occurs where a majority of the employes have not joined a labor organization or where two organizations are competing for membership and either of them engages in a course of conduct intended to coerce the employer to require his employes to become members of any organization. The Pennsylvania Labor Relations Act, supra, provides in section 5 that employes have the right to self-organization, to form, join, or assist labor organizations to bargain collectively through representatives of their own choosing. Section 6 provides that it is an unfair labor practice for an employer to interfere with, restrain, or coerce his employes in the exercise of their rights, or to dominate or interfere with the formation of any labor organization. It is established beyond question that in this case there are two labor organizations competing for membership, and the evidence likewise indicates that it is questionable whether either of them has a majority of the employes in its organization. Certainly it is conceded that both contend they have a majority, and which organization in fact does, is open to question. Complainant's testimony, as well as that of defendant, establishes that the latter has demanded that it be recognized as the exclusive bargaining agent, the re-

sult of which would force the employer to require his employes to join defendant union. At any rate the recognition of either of the associations as the exclusive bargaining agent would constitute an unfair labor practice. This is admitted by defendant.

It is contended, however, that a strike was called because a member of defendant union was improperly discharged for union activities and that the picketing has never been accompanied by force or violence and, therefore, cannot be enjoined: Kirmse et al. v. Adler et al., 311 Pa. 78. There is no question that picketing, if peaceful and unaccompanied by coercion, duress, intimidation or violence is lawful, provided, however, that in addition, it is conducted for a lawful purpose. In the case of Dorchy v. Kansas, 272 U. S. 306, Mr. Justice Brandeis said at page 311:

"The right to carry on business—be it called liberty or property—has value. To interfere with this right without just cause is unlawful. The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted. To collect a stale claim due to a fellow member of the union who was formerly employed in the business is not a permissible purpose. . . . Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike."

The rights of both contending parties in an industrial dispute are not absolute, but are subject to modification and qualification in the interest of society: Thornhill v. Alabama, 310 U. S. 88, 103. Merely striking and picketing, no matter how great or irreparable the damage, is not coercive. That is the weapon of organized labor. That right, however, is subject to the qualification that the means employed are orderly and the purpose for which they are employed is lawful. See also Flashner v. Amalgamated Meat Cutters, etc., 37 D. & C. 337, Tappins, Inc., v. United Credit Stores Employes' Union, C. P. 5 (Phila. Co.), March term, 1940, no. 5447, and Phillips & Ostroff

v. The United Brotherhood of Carpenters, C. P. 7 (Phila. Co.), March term, 1940, no. 5468.

In considering this application for a preliminary injunction, we do not decide the ultimate merits of the case. It does appear, however, that the contention of defendant that the strike was called because of the discharge of an employe is without foundation in fact. The entire history indicates an attempt to unionize complainant's place of business. It is not by reason of complainant's conduct that this has proven difficult, if not impossible. The problem is caused by the character of the employment. We further cannot accept the conclusions reached by the business agent of the union that the Independent Pinboys Association is a company-dominated and -controlled organization. From the evidence presented, only a suspicion of that fact arises. We believe, moreover, that the proper place to try such an issue is before the Labor Relations Board where it is in fact pending. Courts were required to decide the questions arising in labor disputes in the past because no other body had been created to consider them: Kirmse et al. v. Adler et al., supra, p. 83. We now have such an administrative board in this State and both parties have taken advantage of its existence by filing petitions, complainant to secure an election and determine with which organization it is required to bargain, and defendant to have its competing union declared a company-dominated organization. Defendant has not given that body an opportunity to decide the controversy, just as it has apparently refused to abide by the agreements freely entered into by its counsel before this court. During the interim complainant is suffering irreparable damage under facts which we are convinced establish an equitable cause of action. We, therefore, believe that defendant should be enjoined from any further action by way of picketing until a decision is reached by the Pennsylvania Labor Relations Board.

And now, to wit, November 13, 1940, upon a hearing duly held, it is preliminarily ordered and decreed that de-

fendants, The Bowling, Billiard and Athletic Employees Union, Local 209, an unincorporated association, by Thomas Welsh, trustee ad litem, and Thomas Welsh, individually and collectively, and their members, officers, representatives, and agents are enjoined from interfering with the operation of plaintiff's business by picketing or causing to be picketed complainant's establishment and otherwise uttering, declaring, or publishing by placards that complainant's employes are on strike. This injunction shall be effective only until a decision is reached by the Pennsylvania Labor Relations Board on the petitions now before it by the parties hereto, and notice of such decision is given to the parties hereto. Bond to be filed by complainant in the sum of $2,000.